1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                                 DISTRICT OF NEVADA

7                                       * * * * *

8    MOVSES MARJANIAN, Individually and on )
     Behalf of All Others Similarly Situated,    )    3:14-cv-0175-LRH-WGC
9                                                )
                              Plaintiff,         )
10                                               )    ORDER
     v.                                          )
11                                               )
     ALLIED NEVADA GOLD CORP., SCOTT             )
12   A. CALDWELL, ROBERT M. BUCHAN,              )
     RANDY E. BUFFINGTON, STEPHEN M.             )
13   JONES,                                      )
                                                 )
14                            Defendants.        )
                                                 )
15   _____         )
                                                 )
16   JANET MARTINEZ, Individually and on         )
     Behalf of All Others Similarly Situated,    )    2:14-cv-0650-JCM-VCF
17                                               )
                              Plaintiff,         )
18                                               )
     v.                                          )
19                                               )
     ALLIED NEVADA GOLD CORP., SCOTT             )
20   A. CALDWELL, ROBERT M. BUCHAN,              )
     RANDY E. BUFFINGTON, STEPHEN M.             )
21   JONES,                                      )
                                                 )
22                            Defendants.        )
                                                 )
23   _____         )

24           Before the Court is plaintiff Richard Heil and State-Boston Retirement System's

25   ("Heil/Boston") Motion for Reconsideration of the Court's prior Order appointing Andrey

26   Slomnitsky ("Slomnitsky") as lead plaintiff in a class action lawsuit against Defendant Allied

27   Nevada Gold Corporation ("Allied Nevada").  Doc. #70.[1]  Slomnitsky filed an Opposition (Doc.

28   #71), to which Heil/Boston Replied (Doc. #72).

_____
     [1] Refers to the Court's docket number.

1      **I.      Facts and Procedural Background**

2              This is a federal securities class action on behalf of investors who purchased stock of

3      Allied Nevada between January 18, 2013, and August 5, 2013.  Doc. #1 ¶1.  Allied Nevada is a

4      Nevada-based gold producer focused on mining and development in Nevada.  *Id.* ¶2.  In early

5      2013, Allied Nevada announced record production for the fourth quarter of 2012, but added that

6      the company fell short of its production guidance due to "record cold temperatures" that were

7      "adversely affecting" its operations.  *Id.* ¶4.  Soon after, Allied Nevada represented to investors

8      that the company was "back on track" and that the problems had been solved, in addition to other

9      remarks allegedly designed to encourage investment.  *Id.* ¶¶5, 39-70.  In one instance, Allied

10     Nevada President and CEO Scott Caldwell represented that Allied Nevada was "going to have a

11     very strong quarter or a better quarter this quarter than last."  *Id.* ¶42.  Plaintiffs allege that these

12     statements, and others, led to artificially inflated prices**.**  *Id.* ¶6.

13             One of Allied Nevada's central operations recovers gold and silver from oxide ores using

14     a technique that extracts ore from an open pit, crushes it, and places it on impermeable leach

15     pads where the ore is "doused with a weak cyanide solution that dissolves the gold from the ore."

16     *Id.* ¶3.  Despite Allied Nevada's statements that production was back on track, the Lewis leach

17     pad—one of the company's three leach pads—"was beset with operating defects and production

18     deficiencies" that "caused the Company's production costs to skyrocket during the Class Period

19     and resulted in large amounts of unprocessed ore to build up" on Allied Nevada's leach pads.  *Id.*

20     ¶7.  This process consumed a significant portion of the funds that Allied Nevada intended to use

21     for a business expansion.  *Id.*

22             On April 30, 2013, Allied Nevada issued a press release announcing disappointing results

23     for the first quarter of 2013.  *Id.* ¶63.  The press release represented that "uncommonly inclement

24     weather" and "increased mining costs . . . negatively impacted our production costs and adjusted

25     cash costs per ounce."  *Id.*  The press release also stated that despite these unexpected

26     occurrences, "[r]evenue increased 25% in the first quarter of 2013" compared to the first quarter

27     of 2012, and that production from the Hycroft mine increased seventeen percent for gold and

28     thirteen percent for silver.  *Id.*  Additionally, sales for that quarter "surpassed that of the same

period in 2012 by 34% for gold and 36% for silver." *Id.* The Complaint adds that Allied Nevada's Form 10-Q, also filed on April 30, 2013, "contained materially false and misleading representations about Allied Nevada's risk factors, its management's discussion and analysis, its disclosure controls and false misleading certifications thereon." *Id.* ¶67. Despite Allied Nevada's assurances of strong production and sales compared to the first quarter of 2012, the company's stock dropped $1.91 per share in two days, from $11.83 at the close of trading on April 29, 2013, to $9.92 on May 1, 2013. *Id.* ¶71.

On May 2, 2013, Allied Nevada filed an automatic shelf registration statement on Form S-3 with the Securities Exchange Commission. *Id.* ¶72. On May 9, 2013, Allied Nevada filed an amendment to the registration statement, offering to sell fourteen million shares of Allied Nevada stock in a secondary public offering ("SPO"). *Id.* ¶73. The registration statement and amendment did not disclose the material defects and production problems of the Lewis leach pad, or the company's increased production costs and reduced operating income and cash flow. *Id.* ¶75. On May 17, 2013, Allied Nevada announced the closing of its sale of fourteen million shares in the SPO at $10.75 per share. *Id.* ¶85.

On July 22, 2013, Allied Nevada issued a press release announcing that growth in the second quarter had been slower than expected, and noting that "a significant portion of the ore placed on the Lewis leach pad . . . had not been properly leached due to insufficient solution application." *Id.* ¶89. The Complaint states that this statement, and others during the class period, was "materially false and misleading when made because they misrepresented and failed" to disclose a number of facts, including the specifics of the Lewis leach pad defects, and the company's significant cash flow problems. *Id.* ¶90.

On August 6, 2013, Allied Nevada announced that its production costs had increased dramatically and would continue to rise because of the operating defects at the Lewis leach pad. *Id.* ¶8. In essence, the company stated that it would have to double its fresh water usage and replace the existing irrigation tubing, piping, and pumping infrastructure to remedy its production deficiencies. *Id.* Allied Nevada also stated that it would indefinitely suspend its planned expansion as a result of the Lewis leach pad deficiencies. *Id.* ¶9. Following this announcement,

1   Allied Nevada's stock dropped significantly, from $5.90 per share at the close of trading on

2   August 5, 2013, to $3.73 per share at the close of trading on August 7.  *Id.* ¶10.  Weeks before

3   the deficiencies were revealed, Allied Nevada sold $150,500,000 in shares in the SPO.  *Id.* ¶11.

4         Movses Marjanian filed suit in the District of Nevada, Reno on April 3, 2014.  Doc. #1.

5   Heil/Boston and Slomnitsky each purchased Allied Nevada shares during the class period and

6   petitioned to be appointed lead plaintiff in the class action.  Heil/Boston purchased a total of

7   119,910 shares (101,110 net shares) during the class period and claimed a total loss of $638,553.

8   Doc. #17 at 7; *id*, Ex. B.  Slomnitsky purchased a total of 745,613 shares (167,447 net shares)

9   during the class period and claimed a loss of $238,060.[2]  Doc. #37 at 3, 9.  Because each party

10   used a different method to calculate their losses and the losses of the other prospective lead

11   plaintiffs, the Court conducted its own analysis of which party has the largest financial interest in

12   this litigation.  The Court held in its November 7, 2014 Order that Slomnitsky was the

13   presumptive lead plaintiff because he lost $233,437.60 that was directly related to Allied

14   Nevada's August 6, 2013 disclosure, compared to Heil/Boston, which lost $149,465.81 as a

15   result of the August 6, 2013 corrective disclosure.  Doc. #59 at 9, 11.  After finding that

16   Slomnitsky met the adequacy and typicality requirements of Federal Rule of Civil Procedure 23,

17   the Court appointed Slomnitsky as lead plaintiff.  *Id.* at 15.

18         Heil/Boston filed this Motion for Reconsideration on November 21, 2014, asserting that

19   the Court erred in its prior Order because (1) the Court did not consider losses attributable to the

20   April 30, 2013 partial disclosure of fraud, and (2) the Court did not consider Heil/Boston's

21   purchase price of retained shares.  Doc. #70 at 2.  The Court did not consider loss caused by the

22   April 30, 2013 press release because in its original motion for appointment as lead plaintiff,

23   Heil/Boston argued that its losses were equal to its *total losses*, without focusing on Allied

24   Nevada's disclosures.[3]  *See* Doc. #17 at 7.  Heil/Boston referred to the April 30, 2013 press

25   _____

26   [2] This figure represents the one-day decline in Allied Nevada stock price.  Applying the two-day

27   decline in stock price mentioned in the Complaint, Slomnitsky claims a total loss of $340,240 for
     purchases during the class period.  Doc. #37 at 3.

28   [3] The Court held that Heil/Boston could not claim total losses in its presumptive lead plaintiff
     analysis because this would include "what *Dura* sought to prevent: loss figures that take into account not

1  release, but only to challenge Slomnitsky's calculation.  *See* Doc. #36 at 13; Doc. #47 at 6.

2  Heil/Boston calculated its losses based on the total difference between what it spent on Allied

3  Nevada stock and the value retained from the stock, and no party calculated losses that were

4  directly attributable to the April 30, 2013 press release as a corrective partial disclosure, or asked

5  the Court to do so.  Accordingly, the Court did not include the April 30, 2013 disclosure in its

6  calculation of losses to designate the presumptive lead plaintiff.  Here, the Court considers

7  whether such calculation would yield a more accurate determination of lead plaintiff.

8  **II.    Legal Standard**

9           **A.      Appointment of Lead Plaintiff**

10          The Private Securities Litigation Reform Act ("PSLRA") states that in securities class

11  actions, the court must appoint a lead plaintiff "that the court determines to be most capable of

12  adequately representing the interests of class members."  15 U.S.C. § 77z-1(a)(3)(B)(i).  Under

13  the PSLRA, courts adopt a three-step process to determine the lead plaintiff.  *In re Cavanaugh*,

14  306 F.3d 726, 729 (9th Cir. 2002).  First, a plaintiff must publicize the pendency of the action "in

15  a widely circulated national business-oriented publication or wire service."  15 U.S.C. § 78u-

16  4(a)(3)(A)(i).  The notice must alert the public that "any member of the purported class may

17  move the court to serve as lead plaintiff."  15 U.S.C. § 78u-4(a)(3)(A)(i)(II).  Second, the court

18  must select a presumptive lead plaintiff.  *See Cavanaugh*, 306 F.3d at 729-30.  The court adopts a

19  rebuttable presumption that "the most adequate plaintiff" is the person or group that "has the

20  largest financial interest in the relief sought by the class."  15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb).

21  Third, the court must determine whether the presumptive lead plaintiff meets the requirements of

22  Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(cc).  Rule 23

23  requires that the representative of a class have claims that are typical of the class, and that the

24  representative can "adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

25  ///

26

27  just losses caused by the fraud, but also 'changed economic circumstances, changed investor
expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken
28  separately or together account for some or all of that lower price.'"  Doc. #59 at 8 (citing *Dura*, 544 U.S.
at 343).

1   "The 'most capable' plaintiff—and hence the lead plaintiff—is the one who has the

2   greatest financial stake in the outcome of the case, so long as he meets the requirements of Rule

3   23." *Cavanaugh*, 306 F.3d at 729.  The PSLRA includes a limitation on damages whereby a

4   plaintiff cannot recover more than "the difference between the purchase or sale price paid or

5   received . . . and the mean trading price of that security during the 90-day period beginning on

6   the date on which the information correcting the misstatement" occurred.  15 U.S.C. § 78u-

7   4(e)(1).  To determine which plaintiff has the largest financial stake, courts consider the

8   "recoverable damages" of each party pursuant to *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336

9   (2005).  In *Dura*, the Supreme Court held that a court must disregard the purchase price of the

10  stock and only consider losses that are "proximately caused" by the defendant's

11  misrepresenations.  *Dura*, 544 U.S. at 346.  Only losses sustained after the misrepresentation

12  "become generally known" are recoverable.  *Id.* at 344.  This prevents inflated claims of losses

13  that could have been caused "not [by] the earlier misrepresentation, but changed economic

14  circumstances, changed investor expectations, new industry-specific or firm-specific facts,

15  conditions, or other events, which taken separately or together account for some or all of that

16  lower price." *Id.* at 343.  District courts have applied different methods to calculate recoverable

17  losses, but the Ninth Circuit has stated that "the court may select accounting methods that are

18  both rational and consistently applied."  *Cavanaugh*, 306 F.3d at 730 n.4.

19      Once the court determines which plaintiff has the largest financial stake in the outcome of

20  the lawsuit, "the court must appoint that plaintiff as lead, unless it finds that he does not satisfy

21  the typicality or adequacy requirements." *Cavanaugh*, 306 F.3d at 732.  "So long as the plaintiff

22  with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead

23  plaintiff status, even if the district court is convinced that some other plaintiff would do a better

24  job." *Id.*  "If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria,

25  the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial

26  stake." *Id.* at 730.

27      **B.      Motion for Reconsideration**

28      "A district court has the inherent power to reconsider and modify its interlocutory orders

6

1  prior to the entry of judgment." *Smith v. Massachusetts*, 543 U.S. 462, 476 (2005) (quoting

2  *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982)).  However, "a motion for

3  reconsideration should not be granted, absent highly unusual circumstances, unless the district

4  court is presented with newly discovered evidence, committed clear error, or if there is an

5  intervening change in the controlling law." *389 Orange Street Partners v. Arnold*, 179 F.3d 656,

6  665 (9th Cir. 1999).  "A motion to reconsider must provide a court with valid grounds for

7  reconsideration by: (1) showing some valid reason why the court should consider its prior

8  decision, and (2) setting forth facts or law of a strongly convincing nature to persuade the court to

9  reverse its prior decision." *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003).

10  **III.    Discussion**

11       **A.    Partial Corrective Disclosure**

12       Heil/Boston first argues that the Court erred because it did not consider the decline in

13  Allied Nevada stock price following the April 30, 2013 press release.  Heil/Boston argues that

14  the April 30, 2013 disclosures are important because they represented to investors that expansion

15  of the Hycroft Mine "would be implemented in phases and would not be fully operational by

16  January 1, 2015—as previously represented."  Doc. #70-1 at 4.  The press release also "included

17  an announcement that the Company would be offering 14 million shares of common stock . . .

18  despite previous assurances that the Hycroft Mine expansion could be funded without additional

19  offerings."  *Id.* at 4-5.  Heil/Boston argues that in failing to consider the stock reduction

20  following this disclosure, "the Court incorrectly appointed the movant with the ***second*** largest

21  financial interest."  *Id.* at 6 (emphasis in original).

22       Heil/Boston is correct that courts may consider partial corrective disclosures in

23  calculating total recoverable losses.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540

24  F.3d 1049, 1063 (9th Cir. 2008) ("[T]here is no prohibition against [a plaintiff] alleging loss

25  calculation through a series of disclosures by the Defendants."); *In re Maxim Integrated Prods.,*

26  *Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009) ("Loss calculation may be alleged

27  through a series of partial disclosures.").  Based on the allegations in the Complaint, however, the

28  Court is not convinced that the April 30, 2013 press release constitutes a partial corrective

1  disclosure such that losses after the press release should be considered in the Court's calculation

2  of presumptive lead plaintiff.  In relevant part, the April 30, 2013 press release states as follows:

3       ***Hycroft Operations Update***

4       **Revenue increased 25% in the first quarter of 2013** to $49.2 million compared
     with $39.2 million in the first quarter of 2012 as a result of the increased ounces
5       sold, partially offset by lower average realized selling prices for gold and silver. . .

6       **Production from Hycroft in the first quarter of 2013 was an increase of 17%
     for gold and 13% for silver as compared to the first quarter of 2012.**  Sales in
7       the first quarter of 2013 surpassed that of the same period in 2012 by 34% for
     gold and 36% for silver.  When compared to the first quarter of 2012, our 2013
8       adjusted cash costs were negatively impacted by increased mining and processing
     costs and lower realized silver prices.  **Due to uncommonly inclement weather
9       experienced in January and increased mining costs due to Hitachi shovel
     maintenance, the ounces were placed on the leach pads at higher than
10      expected costs and negatively impacted our production costs and adjusted
     cash costs per ounce.  We also consumed higher than expected lime and
11      cyanide as we worked to improve leach pad solution properties, which also
     increased our production costs and adjusted cash costs.**

12

13 Doc. #1 ¶63 (emphasis in original).

14      Courts are often reluctant to consider early disclosures as partial corrective disclosures for

15 purposes of calculating recoverable losses when the statement does not disclose the defendant's

16 fraud and merely presents the possibility for lost revenue.  In *In re REMEC Inc. Securities*

17 *Litigation*, the court held that disclosure of information showing certain profits but also "a

18 decrease in gross profit margin, an increase in operating expenses, an operating loss, and a

19 decrease in cash and short term investments" did not constitute a partial corrective disclosure

20 because the disclosure itself "contained false and misleading information about the company's

21 financial condition, and the [complaint] characterize[d] the statements regarding profitability as

22 additional misrepresentations, not as statements that corrected previous misrepresentations."  702

23 F. Supp. 2d 1202, 1270 (N.D. Cal. 2010).  Similarly, Allied Nevada's April 30, 2013 press

24 release primarily describes the potential for lost profits, and the Complaint states that Allied

25 Nevada's April 30, 2013 Form 10-Q, filed the same day as the press release, "contained

26 materially false and misleading representations about Allied Nevada's risk factors, its

27 management's discussion and analysis, its disclosure controls and false misleading certifications

28 thereon."  Doc. #1 ¶67.

1    In *Foster v. Maxwell Technologies*, the court held that an early disclosure was not a

2    partial corrective disclosure for loss calculation purposes because "although the complaints filed

3    in the Related Actions mention [the] earnings miss, none of them identify this or any other

4    announcement prior to the [primary disclosure date] as disclosing, in whole or in part,

5    [defendant's] alleged fraud."  2013 WL 5780424, at *4 (S.D. Cal. Oct. 24, 2013).  Similarly, the

6    April 30, 2013 press release did not disclose Allied Nevada's alleged fraud concerning the Lewis

7    leach pad, and it is important to note that statements made by Allied Nevada following the April

8    30, 2013 press release furthered the company's fraud.  *See, e.g.*, Doc. #1 ¶75 (noting that the May

9    2013 SPO registration statements did not disclose the material defects and production problems

10   associated with the Lewis leach pad).  The Court is careful not to include a supposed disclosure

11   in its loss calculation because considering losses prior to the central corrective disclosure risks

12   exactly what *Dura* sought to prevent: loss figures that take into account not just losses caused by

13   the fraud, but also "changed economic circumstances, changed investor expectations, new

14   industry-specific or firm-specific facts, conditions, or other events, which taken separately or

15   together account for some or all of that lower price." *Dura*, 544 U.S. at 343.

16   It is also important to note that the April 30, 2013 disclosure is not nearly as definite as

17   the August 6, 2013 disclosure.  The Complaint describes the April 6, 2013 disclosed as follows:

18   On August 6, 2013, the Company issued a press release announcing its financial
     results from the 2013 quarter, the period ended June 30, 2013 and the indefinite
19   deferral of the Hycroft mill construction.  Moreover, Defendants disclosed that: (i)
     the Company's operations consumed $18.7 million in cash, and (ii) Allied
20   Nevada's had higher than anticipated $775 adjusted cash costs per ounce of gold
     sold in the second quarter of 2013 (an increase of more than 27% from the 2013
21   first quarter), which was primarily attributable to costs associated with the
     remediation of the Lewis leach pad, reduced silver sales, increased maintenance
22   costs for older loading equipment, and inefficient utilization of the mobile fleet.
     As a result of these factors, Allied Nevada announced that it expected its adjusted
23   cash costs per ounce of gold sold for the 2013 fiscal year to increase to a range
     between $800 to $825 per ounce of gold sold.

24

25   Doc. #1 ¶91.  As opposed to the April 30, 2013 press release, this disclosure unambiguously

26   announced the *indefinite* deferral of the Hycroft mill construction.  It also provided specifics

27   about the company's increased costs attributable to problems with the Lewis leach pad, and the

28   Complaint does not allege that it included misrepresentations designed to encourage further or

9

1  continued investment.  Additionally, the April 30, 2013 press release described problems that had

2  previously impacted Allied Nevada production, and had previously been disclosed to investors.

3  *See* Doc. #1 ¶4 (noting that in early 2013, Allied Nevada stated that the company had previously

4  missed its production guidance because "'record cold temperatures' were 'adversely affecting

5  how much solution'" Allied Nevada could pump onto the leach pads).  The Court finds that

6  while the April 30, 2013 press release stated the potential for serious problems with the Hycroft

7  project, the April 6, 2013 press release was the operative disclosure of Allied Nevada's alleged

8  fraud because it stated the indefinite deferral of the Hycroft mill construction and provided new

9  specifics of the alleged fraud to investors.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d

10  982, 987 (9th Cir. 2008) ("Learning that stop-work orders *might* be issued is quite different from

11  knowing they were *in fact* issued. One indicates risk, the other uncertainty. It goes without saying

12  that investors would treat the two differently.").

13       Heil/Boston is correct that courts have stated that calculations based only on shares

14  retained at the date of the last corrective disclosure "are not appropriate in cases where multiple

15  partial corrective disclosures are alleged over time."  *Mulligan v. Impax Labs., Inc.*, No. 13-1037,

16  2013 WL 3354420, at *6 (N.D. Cal. July 2, 2013).  Despite this statement, however, the

17  *Mulligan* court ultimately held that the retained shares method was most appropriate because it

18  had "the advantage of looking to losses experienced due to the shares that the plaintiff was

19  holding at the time the fraud was disclosed, and thus focusing on losses caused when stock

20  purchased at artificially inflated prices decreases in value due to the disclosure of the fraud."  *Id.*

21  The court added that this "metric therefore excludes losses caused by normal market fluctuations

22  prior and related to the disclosure of the fraud."  *Id.*

23       The Court has discretion to "select accounting methods that are both rational and

24  consistently applied."  *Cavanaugh*, 306 F.3d at 730 n.4.  Here, the Court finds that the most

25  accurate calculation of losses directly attributable to Allied Nevada's fraud disclosure is based on

26  shares retained or sold after the August 6, 2013 press release, when the Hycroft project was

27  indefinitely suspended and Allied Nevada provided investors new specifics regarding the Lewis

28  leach pad defects and the company's financial problems.

**B.      Purchase Price Consideration**

Heil/Boston also argues that the court's calculation for presumptive lead plaintiff "failed to properly take into consideration the purchase price of retained shares, as required by the PSLRA's limitation on damages." Doc. #70-1 at 7.  The PSLRA states that when shares are sold prior to the 90-day period following a corrective disclosure, damages "shall not exceed the difference between the purchase or sale price paid or received . . . and the mean trading price of the security during the period beginning immediately after" the corrective disclosure and ending when the plaintiff sells or repurchases the security.  15 U.S.C. § 78u-4(e)(2).  To calculate Heil/Boston's recoverable damages, the Court multiplied the number of retained shares by the difference between the August 5, 2013 closing price and the greater of the actual sale price and the 90-day trailing average.  *See* Doc. #59 at 8.  Heil/Boston argues that "by failing to take into consideration the actual purchase prices of the stock, the Court's methodology did not properly apply the first component of the PSLRA's limitation on damages." Doc. #70-1 at 7. Accordingly, Heil/Boston argued that the Court "should have started with ***the lesser of*** the purchase price of the retained shares and the closing price prior to the corrective disclosure . . . and subtracted from that the greater of the actual sale price and the trailing average." *Id.* at 8.

To provide a more accurate calculation, Allied Nevada's expert Kenneth Kotz ("Kotz") followed the Court's methodology for calculating losses with two changes: Kotz used (1) "the higher of the actual sale price and rolling average price through the date of sale as the price to calculate losses for shares sold during the 90-day period," and (2) "the lower of the August 5, 2013 price and the actual purchase price for the calculation of approximate losses" pursuant to the PSLRA.[4]  Doc. 70-3, Ex. A at 7-8.  Based on this updated methodology, Kotz calculated that Heil/Boston's losses caused by the August 6, 2013 disclosure totaled $145,706 and Slomnitsky's

---

[4] In its prior Order, the Court was unable to calculate the rolling average price through the date of each sale because the parties had not submitted the daily closing prices of Allied Nevada stock.  *See* Doc. #59 at 11.  Although the Court still has not reviewed the daily closing prices of Allied Nevada stock over the class period and in the ninety days following the August 6, 2013 disclosure, the Court accepts Kotz's calculations for the purposes of this Order.

1    losses caused by the August 6, 2013 disclosure totaled $265,057.[5]  *Id.*, Ex. 6.  The Court accepts

2    these calculations as accurate based on the PSLRA for the purposes of this Order.

3          Even with the updated figures, Slomnitsky remains the presumptive lead plaintiff because

4    his losses attributable to the August 6, 2013 corrective disclosure are larger that Heil/Boston's.

5    Heil/Boston therefore relies on the fact that losses following the April 30, 2013 press release

6    would increase its total losses to $275,105—based on Kotz's calculations[6]—while Slomnitsky's

7    losses would remain at $265,057 because Slomnitsky did not begin investing in Allied Nevada

8    until after the April 30, 2013 press release.  *See id.*  Accordingly, Heil/Boston would become the

9    presumptive lead plaintiff if the Court accepted the April 30, 2013 press release as a partial

10   corrective disclosure, and Kotz's calculations for the losses caused by that disclosure.  However,

11   the Court has found that Heil/Boston has failed to produce new evidence that the Court must

12   consider losses caused by the April 30, 2013 press release, and in fact, that considering such

13   losses would contravene the loss limitation described by *Dura*.  Accordingly, the Court declines

14   to reconsider its November 7, 2014 Order and reaffirms Slomnitsky as the lead plaintiff in this

15   class action.

16   **IV.   Conclusion**

17         IT IS THEREFORE ORDERED that Heil/Boston's Motion for Reconsideration (Doc.

18   #70) is DENIED.

19         IT IS SO ORDERED.

20         DATED this 8th day of January, 2015.

21                            _____

22                       LARRY R. HICKS
                    UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

---

[5] These figures are based on a "first-in first-out" ("FIFO") calculation.  Under Kotz's "last-in last-out" ("LIFO") calculation, Heil/Boston would have $149,456 in losses based on the August 6, 2013 disclosure, compared to Slomnitsky's $278,158.  Doc. #70-3, Ex. 6.

[6] $275,105 under a FIFO calculation, or $278,158 under a LIFO calculation.  Doc. #70-3, Ex. 6.

12