1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                                    DISTRICT OF NEVADA

8                                             * * *

9    IN RE ALLIED NEVADA GOLD CORP.,
     SECURITIES LITIGATION

10                                                      3:14-CV-00175-LRH-WGC

11

12                                                      <u>ORDER</u>

13

14

15          Before the court is Defendants' Motion to Dismiss.  ECF No. 103.[1]  Lead Plaintiff

16   Andrey Slomnitsky ("Plaintiffs") filed an Opposition (ECF No. 109), to which Defendants

17   replied (ECF No. 110).  Defendants also filed a Request for Judicial Notice.  ECF No. 104.  Oral

18   argument was heard before the Court on March 30, 2016.  ECF No. 117.

19   **I.      Facts and Procedural History**

20          This is a federal securities class action on behalf of investors who purchased stock in

21   Defendant Allied Nevada Gold Corporation ("Allied") between January 18, 2013, and August 5,

22   2013.  One of Allied Nevada's central operations recovers gold and silver from oxide ores using

23   a technique ("heap leaching") that extracts ore from an open pit, crushes it, and places it on

24   impermeable leach pads where the ore is doused with a weak cyanide solution that dissolves the

25   gold from the ore.  One of the company's three leach pads, the Lewis leach pad, was beset with

26   operational difficulties between January 18, 2013, and August 5, 2013, inclusive (the "Class

27

28   _____
     [1] Refers to the Court's docket number.

                                               1

Period").  Allied issued a variety of press releases and financial information[2] during the Class Period and also conducted several conference calls from January to May that Plaintiffs allege contained a number of materially false and misleading statements concerning the operations of the Lewis leach pad, Allied's cash position and access to capital, the expansion of the Hycroft mine, and Allied's favorable financial guidance.  Plaintiffs then allege that the truth was slowly revealed from May until August, beginning with Allied's April 30, 2013 press release; Form 10-Q; and May 1, 2013 conference call, which announced Allied's planned secondary public offering ("SPO").  On May 2, 2013, Allied filed an automatic shelf registration statement on Form S-3 with the Securities Exchange Commission ("SEC").  On May 9, 2013, Allied filed an amendment to the registration statement, offering to sell fourteen million shares of Allied stock in a SPO.  On May 17, 2013, Allied announced the closing of its sale of fourteen million shares in the SPO at $10.75 per share.  On July 8 and 22, 2013, Allied released two further press releases which Plaintiffs contend further exposed the truth.   On August 6, 2013, Allied issued a press release and held a conference call in which Plaintiffs contend the truth was finally completely exposed.  Allied announced that its production costs had increased dramatically and would continue to rise because of the operating defects at the Lewis leach pad.  Allied also stated that it would indefinitely suspend its planned expansion as a result of the Lewis leach pad deficiencies.  Following this announcement, Allied's stock dropped significantly, from $5.90 per share at the close of trading on August 5, to $3.73 per share at the close of trading on August 7.

On April 3, 2014, the first complaint was filed in this action.  ECF No. 1.  On November 7, 2014, the case was consolidated, and Andrey Slomnitsky was named lead plaintiff.  ECF No. 59.  On March 10, 2015, Allied filed for Chapter 11 bankruptcy.  ECF No. 95.  On May 1, 2015, an amended complaint was filed.  ECF No. 98.  The consolidated complaint alleged two causes of action: (1) Violation of Section 10(b) of the Exchange Act and Rule 10b-5 and (2) Violation of Section 20(a) of the Exchange Act.  On September 29, 2015, Defendants filed a motion to dismiss and a request for judicial notice.  ECF No. 103 and 104.  On

---

[2] Specifically, Allied's January 18, 2013 press release and conference call; February 22, 2013 press release; February 25, 2013 press release and conference call; 2012 Form 10-K; March 21, 2013 press release; March 27, 2013 press release; April 8, 2013 press release; and April 9, 2013 conference call.

1    December 5, 2015, Plaintiffs filed a response to the motion to dismiss.  ECF No. 109.  On

2    February 1, 2016, Defendants filed a reply.  ECF No. 110.

3    **II.     Legal Standard**

4            Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include a

5    "short and plain statement of the claim showing that the pleader is entitled to relief."

6    Fed.R.Civ.P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to

7    Federal Rule of Civil Procedure 12(b)(6).  Dismissal under Rule 12(b)(6) may be based on either

8    (1) the "lack of a cognizable legal theory," or (2) "the absence of sufficient facts alleged under a

9    cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

10   In considering whether the complaint is sufficient to state a claim, the court accepts as true all of

11   the factual allegations contained in the complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

12   However, the court need not "accept as true allegations that contradict matters properly subject

13   to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted

14   deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049,

15   1055 (9th Cir.2008) (internal quotation marks omitted).  While a complaint need not allege

16   detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a

17   claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 677 (quoting *Bell Atl. Corp. v.

18   Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to

19   draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

20           Because Plaintiffs have brought securities fraud claims under the PSLRA, Rules 8 and

21   12(b)(6) are not the only governing legal standards.  Plaintiffs must also satisfy the heightened

22   pleading standards set forth by Rule 9(b) of the Federal Rules of Civil Procedure and by the

23   PSLRA itself.  *Zucco Partners,* 552 F.3d 981, 990 (9th Cir. 2009).  Rule 9(b) of the Federal

24   Rules of Civil Procedure requires a plaintiff alleging fraud or mistake to "state with particularity

25   the circumstances constituting fraud or mistake."  Fed.R.Civ.P. 9(b); *Nursing Home Pension

26   Fund, Local 144 v. Oracle Corp*., 380 F.3d 1226, 1230 (9th Cir. 2004).  In addition, the PSLRA

27   requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter."

28   *Zucco Partners*, 552 F.3d at 990.  With respect to falsity, the complaint must "specify each

1    statement alleged to have been misleading, [and] the reason or reasons why the statement is

2    misleading." 15 U.S.C. § 78u–4(b)(1).  To the extent an allegation is based on information and

3    belief, "the complaint shall state with particularity all facts on which that belief is formed."  *Id.*

4    "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating

5    why those statements were false, does not meet this standard."  *Metzler Inv. GMBH v.*

6    *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  With respect to scienter, the

7    complaint must "state with particularity facts giving rise to a strong inference that the defendant

8    acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  That is, plaintiffs must plead

9    with particularity the facts evidencing "the defendant's intention 'to deceive, manipulate, or

10   defraud.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst*

11   *& Ernst*, 425 U.S. at 194 n.12).  To satisfy the rigorous pleading standards of the PSLRA, the

12   complaint's scienter allegations must give rise not simply to a plausible inference of scienter, but

13   rather to an inference of scienter that is "cogent and at least as compelling as any opposing

14   inference of nonfraudulent intent."  *Id*. at 314.

15          Furthermore, a court may take judicial notice of "records and reports of administrative

16   bodies."  *Interstate Natural Gas Co. v. Southern California Gas Co*., 209 F.2d 380, 385 (9th Cir.

17   1953).   Under the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject

18   to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of

19   the trial court or (2) capable of accurate and ready determination by resort to sources whose

20   accuracy cannot reasonably be questioned."  Fed.R.Evid. 201(b).  "A court shall take judicial

21   notice if requested by a party and supplied with the necessary information."  Fed.R.Evid. 201(d).

22   **III.    Discussion**

23          **A.  Judicial Notice**

24          "Although generally the scope of review on a motion to dismiss for failure to state a

25   claim is limited to the Complaint, a court may consider evidence on which the complaint

26   necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the

27   plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6)

28   motion."  *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal

                                                      4

quotations and citations omitted).  The court may "treat such a document as 'part of the

complaint, and thus may assume that its contents are true for purposes of a motion to dismiss

under Rule 12(b)(6).'"  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United

States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).  Here, Plaintiffs' Complaint refers to and

quotes from the contents of Allied's January 18, 2013 press release; January 18, 2013 earnings

call; February 22, 2013 press release; February 25, 2013 press release; February 25, 2013

earnings call; 2012 Form 10-K; March 21, 2013 press release; March 27, 2013 press release;

April 8, 2013 press release; April 9, 2013 earnings call; April 30, 2013 press release; Form 10-Q

for the quarter ending March 31, 2013; May 1, 2013 earnings call; Prospectus Statement; July 8,

2013 press release; July 22, 2013 press release; August 6, 2013 press release; and August 6, 2013

earnings call.  Moreover, Plaintiffs do not dispute the authenticity of these documents.  Therefore

judicial notice of Exhibits A–R is appropriate.

Defendants also ask that this Court take judicial notice of Exhibit S, which contains a

graphical representation of the published stock prices for Allied from September 28, 2012,

through August 30, 2013; a table showing the published stock prices for Allied from October 1,

2012, through August 9, 2013; a graphical representation of the published prices for gold from

September 25, 2012, through August 30, 2013, and from June 12, 2009, through August 30,

2013; and tables showing the published prices for gold from October 1, 2012, through

December 31, 2012, and from April 30, 2013, through August 9, 2013.  Under Federal Rule of

Evidence 201(b) a Court may take judicial notice of a fact that is "not subject to reasonable

dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court

or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonably be questioned."  Fed.R.Evid. 201(b).  This includes a company's published stock

prices.  *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814, 817 (C.D. Cal. 2004).  It also

includes "publicized commodities prices."  *In re Crude Oil Commodity Futures Litig.*, 913 F.

Supp. 2d 41, 52 (S.D.N.Y. 2012).  Further, Plaintiffs have not objected to any of Allied's

exhibits.  Therefore, judicial notice of Exhibit S is appropriate.

///

**B.  Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful "for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  SEC Rule 10b–5, promulgated under the authority of section 10(b), in turn, provides:

> It shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The basic elements of a Rule 10b–5 claim, therefore, are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005).

It is well established that claims brought under Rule 10b–5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b).  *See Semegen v. Weidner*, 780 F.2d 727, 729, 734–35 (9th Cir.1985).  Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Further, the enactment of the Private Securities Litigation Reform Act ("PSLRA") in 1995 significantly altered pleading requirements in private securities fraud litigation by amending the 1934 Exchange Act to require that a complaint "plead with particularity both falsity and scienter." *Gompper v. VISX, Inc*., 298 F.3d 893, 895 (9th Cir. 2002) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)); *see also Nursing Home*, 380 F.3d at 1230.  A securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Gompper*, 298 F.3d at 895 (quoting 15 U.S.C. § 78u–4(b)(1)).

1    The complaint must also "state with particularity facts giving rise to a strong inference that the

2    defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)); *see also*

3    *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (facts must come closer

4    to demonstrating intent as opposed to mere motive  and opportunity).  The stricter standard for

5    pleading scienter naturally results in a stricter standard for pleading falsity, because "'falsity and

6    scienter in private securities fraud cases are generally strongly inferred from the same set of

7    facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In*

8    *re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (quoting *Ronconi*, 253 F.3d at

9    429).  Thus, the complaint must allege that the defendants made false or misleading statements

10   either intentionally or with deliberate recklessness.  *Silicon Graphics*, 183 F.3d at 974.

### 1.   Material Misrepresentation or Omission of Fact

#### a.   Falsity

13   To assert a claim under the PSLRA, the plaintiff must plead with particularity, *inter alia*,

14   the element of falsity.  *Zucco Partners*, 552 F.3d at 990–91.  "The PSLRA has exacting

15   requirements for pleading 'falsity.'"  *Metzler*, 540 F.3d at 1070.  To satisfy these "exacting

16   requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were

17   false.  *Id.*; *Ronconi*, 253 F.3d at 434 ("Plaintiffs' complaint was required to allege specific facts

18   that show" how statements were false); *see also In re Stratosphere Corp. Sec. Litig.*, No. CV–S–

19   96–708–PMP, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must

20   provide "evidentiary facts contemporary to the alleged false or misleading statements from

21   which this court can make inferences permissible under Rule 9(b).").  Moreover, to be

22   actionable, a statement must be false "at [the] time by the people who made them." *Ronconi*,

23   253 F.3d at 430.  "The fact that [a] prediction proves to be wrong in hindsight does not render

24   the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d at 871.  Mere "allegations

25   that defendants should have anticipated future events and made certain disclosures earlier than

26   they actually did do not suffice to make out a claim of securities fraud." *Operating Local 649*

27   *Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010).  It is

28   "clearly insufficient for plaintiffs to say that [a] later, sobering revelation[ ] make[s][an] earlier,

cheerier statement a falsehood." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (alterations in original). Moreover, it is similarly well-settled in the Ninth Circuit that "fraud by hindsight is not actionable." *Ronconi*, 253 F.3d at 430 n.12 (internal quotation marks omitted).

Defendants argue that Plaintiffs have alleged no facts that suggest that the alleged misstatements were false when they were made, and they are instead improperly pleading fraud by hindsight. Plaintiffs argue that Defendants made materially false and misleading statements during the Class Period regarding: (i) the operations of the Lewis leach pad; (ii) Allied's cash position and access to capital; (iii) the mine expansion; and (iv) Allied's financial guidance.

### i.       Operations of the Lewis Leach Pad

Plaintiffs allege that throughout the Class Period, Defendants represented that Allied had overcome any operational issues at the Lewis leach pad and production was going well and that these statements were all false when made. For example, Plaintiffs point to statements like Allied "is confident that the challenges we have encountered with heap leach operation are short term in nature" (Jan. 18 press release), Allied was "beyond that now and production is looking pretty good" (Feb. 25 conference call), and "[w]'e're comfortable that we can get the recoveries that we want out of the ore" (April 9 conference call) as false and misleading when made. They also identify statements by confidential witnesses ("CW") and statements by Randy Buffington ("Buffington") in July and August that a significant portion of the ore placed on the Lewis leach pad in late 2012 and early 2013 had not been properly leached because of infrastructure problems. For example, CW3 and CW4 indicated that an inadequate supply of fresh water was an ongoing and serious problem. They argue this shows that operational issues were a concern and that this is confirmed when Buffington stated in August that a lack of fresh water was an important reason why ore placed on the Lewis leach pad did not get leached.

Defendants respond that they were aware of operational problems and disclosed them throughout the Class Period. They point to statements like "we got too aggressive on how quickly we thought we could see this breakthrough on all of our ore … I mean, it's not good" (Jan. 18 conference call), "performance at the Hycroft Mine [has been] below expectations for some time" (March 27 press release), there's a "lot of work to do on the site" and Allied's

"biggest problem" was the "solution to ore ratio" (April 9 conference call), and Allied was "in need of excess lime during the quarter" and there was a "big increase in the stockpiles" of unprocessed ore due to the low "solution to ore ratio" (May 1 conference call) as evidence that they continuously disclosed issues to investors.  They further note that Plaintiffs acknowledge that disclosures were made about the issues at the Lewis leach pad on April 30 and May 1. Moreover, in the August 6 conference call, Buffington explains that Defendants did not understand the full extent of the issues with the Lewis leach pad until "late May and early June." This is confirmed by CW1, who states that in an attempt to identify the cause of the low recovery at the Lewis leach pad, Allied performed sonic drilling, which took place in June and July 2013. The full results were not yet known by the time CW1 left Allied in August 2013.

Plaintiffs have not adequately alleged that Defendants' statements were false when made. The mere fact that Defendants made statements, which in retrospect, may have been wrong or overly optimistic,  are not facts "that would support an inference that the company's more optimistic [statements] were known to be false or misleading at the time by the people who made them."  *Ronconi*, 253 F.3d at 430; *see also In re VeriFone*, 11 F.3d at 871 ("The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made."). The Defendants argue that the company did not discover the full extent of operation issues until late May and early June and that the issues with the tubing on the Lewis leach pad were not discovered until late in the second quarter.   This position is supported by Plaintiffs' own confidential witness.  CW1 states that he learned recovery at the Lewis leach pad was lower than expected in late May 2013 and performed sonic drilling in June and July of 2013 to attempt to identify the cause of the problem, indicating that the full extent of the problem was not known until well after the first "partial disclosure" of the leaching problems on April 30 and May 1, 2013.  Moreover, to meet their heightened pleading standard, Plaintiffs must "set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgements, but rather the result of a falsehood."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), superseded by statute on other grounds as stated in *SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011).  Plaintiffs have not

1    done this.  Their confidential witnesses either support the idea that the severity of the problems

2    with the Lewis leach pad became known gradually over time or rely on general accusations that

3    "everybody knew."  Unreliable hearsay and conclusory assertions do not demonstrate that a

4    confidential witness is reliable.  *Zucco Partners*, 552 F.3d at 981.  Therefore, Plaintiffs have

5    failed to support the idea that Defendants' statements during the Class Period were false at the

6    time they were made.

7                                    **ii.      Cash Position and Access to Capital**

8              Plaintiffs argue that during the Class Period, Defendants falsely represented that Allied

9    had sufficient cash-on-hand and access to capital to fund its operations and the Hycroft mine

10   expansion.  They highlight alleged misrepresentations like "Management still believes that we

11   can fund this expansion with cash on hand … We're not looking at equity" (Feb. 25 conference

12   call), "We have adequate funding in place.  We would like to build ourselves some cushion.

13   We're in no hurry to build that cushion.  We have ample time to do so and we would do that with

14   the non-equity funding sources") (April 9 conference call), "There is absolutely no need – there

15   will not be an equity issue" (April 9 conference call), and "We believe that cash flow from our

16   ongoing business, when combined with our other sources of liquidity … will be sufficient over at

17   least the next twelve months to meet operational needs, make capital expenditure, invest in the

18   business and service debt due" (Form 10-Q).  Plaintiffs argue that these statements are rendered

19   false by Allied's secondary public offering on May 1, 2013, and that this is supported by CW2's

20   assertions of ongoing cash flow issues apparent as early as March 2013.  For example, CW2

21   states that Allied raided the construction budget to keep the mine operational and failed to timely

22   pay a developer in April 2013.

23            Defendants respond that their representations were not actionable misstatements, but

24   statements that are consistent with their evolving understanding of the business challenges and

25   changing market conditions they faced.  They argue that this is consistent with CW2's statements

26   that Allied was short on cash as early as March and their cash position worsened in late April.

27   Defendants stated that as they continued to experience operational issues in late April and the

28   price of gold declined, they were forced to raise money in the markets rather than rely on cash

                                                            10

flow from the mine.  Robert Buchan ("Buchan") points this out in the May 1 conference call, stating "Clearly, it's not something I'm happy about.  It's not what I would have liked to have done, but I believe it was a smart call" and noting that "A $200 decline in gold, this had obviously a negative impact on our possibility of completing the build without some changes, specifically the cash flow anticipated to come from the operation in '13 and '14."

Here, Plaintiffs do not sufficiently plead that Defendants' change in position was the result of deliberate falsehoods, as opposed to the exercise of legitimate business judgment.  *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp*., 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013).  While CW2 does allege funding shortages as early as March 2013, this alone is not enough to support the idea that Defendants were not being optimistic, but actively lying when they stated that the mine expansion could be funded without raising money in the markets. Plaintiffs have not alleged any facts that establish that when making those optimistic statements, Defendants were not relying on their legitimate business judgment. The "fact that some of these decisions and judgments proved later to be wrong is not actionable*." City of Roseville*, 963 F. Supp. 2d at 1109. To establish falsity, a plaintiff must do more than plead fraud by hindsight.

### iii.    The Mine Expansion

Similarly, Plaintiffs allege that Defendants made numerous misleading statements about the status of the Hycroft mine expansion.  For example, Defendants stated that the expansion project was "on track to meet commissioning deadlines" (March 21 press release); the expansion was a "doable plan" (April 9 conference call), and "Management still believes that we can fund this expansion with cash on hand" (February 25 conference call).  They argue that these are actionable misrepresentations because Allied was unable to fund or advance the Hycroft mine expansion, which they announced would be phased on April 30 and put on hold on August 6.

Defendants argue that Plaintiffs establish no specific facts showing that Defendants knew of the severity of problems at the Lewis pad before late May and early June, so there is no basis to doubt that Defendants believed that they could fund the expansion projects before that time. They also note that the dramatic drop in the price of gold was the major reason for the change in

1   expansion plans, as stated in the August 6, 2013 press release ("stating the decision was made, in
2   part, in response to "sharp gold and silver price declines during the second quarter").

3       As detailed above, Plaintiffs have not alleged sufficient facts to demonstrate that
4   Defendants were aware of the severity of the problems at the Lewis leach pad before they made
5   their alleged corrections.  While Defendants did make optimistic statements about their ability to
6   complete the mine expansion, Plaintiffs have not sufficiently alleged facts to show that their
7   statements went beyond optimism based on their legitimate business judgment and into the realm
8   of falsehood.  "Honest optimism followed by disappointment is not the same as lying or
9   misleading with deliberate recklessness."  *Ronconi*, 253 F.3d at 432.

10                          **iv.    Allied's Financial Guidance**

11      Plaintiffs also argue that during the Class Period, Defendants maintained favorable
12  financial guidance but failed to inform the market of the impact of Allied's constrained cash flow
13  and elevated costs.  They note that at the end of the Class Period, Defendants disclosed that
14  annual production would be lower than their previous representations.

15      Defendants respond that Plaintiffs point to no facts suggesting that Defendants did not
16  believe the projections were true when they made them and that the only specific fact they allege
17  is that Defendants revised their production projections downward, contradicting their earlier
18  projections.

19      Here, Plaintiffs do not provide the underlying facts necessary to satisfy their heightened
20  pleading standard.   The only real facts Plaintiffs allege to show that Defendants' financial
21  projections were false when made was that they were later revised downward.  The mere fact
22  that Defendants revised their projections isn't enough to sustain a securities action.  "The fact
23  that [a] prediction proves to be wrong in hindsight does not render the statement untrue when
24  made."  *In re VeriFone*., 11 F.3d at 871.  It is "clearly insufficient for plaintiffs to say that [a]
25  later, sobering revelation[ ] make[s][an] earlier, cheerier statement a falsehood," and that is
26  essentially what Plaintiffs are arguing here. *Yourish*, 191 F.3d at 997 (alterations in original).
27  ///
28  ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### b.  Puffery

In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements.  *In re Impac Mortg. Holdings, Inc.*, 554 F.Supp.2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.").  This is because "[w]hen valuing corporations, ... investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."  *In re Cutera*, 610 F.3d at 1111; *see also In re iPass, Inc. Sec. Litig.*, No. C 05–00228 MHP, 2006 WL 496046, at *4 (N.D. Cal. Feb. 28, 2006) (generalized statements of optimism are not actionable because they are "'not capable of objective verification,'" and "'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'") (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).  Thus, for example, a court has held not actionable as "mere puffery" statements that "[w]e are very pleased with the learning from our pilot launch," "so far we're getting really great feedback," and "we are very pleased with our progress to date."  *Wozniak v. Align Tech., Inc.*, No. C 09–3671 MMC, 2012 WL 368366, at *4–5 (N.D. Cal. Feb. 3, 2012).  Likewise, "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years' " have been held not actionable as mere puffery.  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868–89 (N.D. Cal. 2004) ("run-of-the-mill" statements such as "business remained 'strong' " are not actionable under § 10(b)); *In re LeapFrog Enter., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) (vague statements such as "This is going to be a very big second half for us," "Our underlying sell-through at the retail level remained very strong throughout the third quarter," "consumer demand for our learning products is more vibrant than ever," and "We are pleased with our progress" were not actionable under § 10(b)); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F.Supp.2d 1045, 1064 (N.D. Cal.

13

1   2012) (statements that "[b]oth Verizon and AT&T are strong partners," company has "strong

2   demand metrics and good momentum" and "our demand indicators are strong, our product

3   portfolio is robust" are unactionable statements of corporate optimism).

4         Defendants argue that many of the statements at issue here are actually inactionable

5   examples of corporate puffery such as "[w]e believe we are on track to meet … production

6   guidance" (April 8 press release), "I've seen nothing that concerns me" (April 9 conference call),

7   and "I have a lot of confidence in the people that we have doing this project" (April 9 conference

8   call).  Plaintiffs respond that because the misrepresentations implicated critical aspects of the

9   Company's operations and were specifically intended to induce reliance, they were taken out of

10   the realm of non-actionable puffery.

11         "When determining whether statements amounted only to puffery, the court must analyze

12   the context in which the statements were made."  *In re Bridgepoint Educ., Inc. Sec. Litig.*, No.

13   3:12-CV-1737 JM (WMC), 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013).  Thus, even a

14   statement of opinion or an expression of corporate optimism may be deemed actionable in

15   certain circumstances because "there is a difference between enthusiastic statements amounting

16   to general puffery and opinion-based statements that are anchored in 'misrepresentations of

17   existing facts.'"  *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260,

18   310 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)); *see also*

19   *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere

20   statement of opinion standing alone may be actionable as an integral part of a representation of

21   material fact when used to emphasize and induce reliance upon such a representation").

22   Accordingly, the courts do not evaluate the statements in a vacuum by "plucking the statements

23   out of their context to determine whether the words, taken per se, are sufficiently 'vague' so as to

24   constitute puffery," but rather examine the entire statement and its circumstances to determine if

25   it is actionable.  *Scritchfield v. Paolo*, 272 F. Supp. 2d 163, 176 (D.R.I. 2003).

26         Here, while Plaintiffs may have relied on these statements, the fact remains that they

27   represent the "feel good speak that characterizes non-actionable puffing."  *Police Ret. Sys. of St.*

28   *Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (internal quotation

1   removed).  Statements like "we believe we are on track" and "I have a lot of confidence in the

2   people that we have doing that project" are the sort of optimistic, subjective assessments that do

3   not amount to a securities violation.  *See, e.g., In re Cutera,* 610 F.3d at 1112 ("[N]one of our

4   employees is represented by a labor union, and we believe our employee relations are good" and

5   "everything is clicking [for the 1990s] ... new products are coming in a wave, not in a trickle ...

6   old products are doing very well").  While the context in which the statements are made does

7   play a role in determining if they form a basis for a securities fraud claim, the situation here is

8   not like the cases where such statements were found actionable.  In *Warshaw,* "the company,

9   whose financial success depended on FDA approval ... made repeated assurances that FDA

10  approval was 'imminent' " when it knew that it was not.  *Syntex Corp. Sec. Litig.*, 95 F.3d at 927

11  (analyzing *Warshaw*).  So too in *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir.1995), "where

12  company officials had made statements that the company's expansion of its retail warehouse

13  operations was successful and that the expansion increased the company's prospects for

14  earnings," when the officials knew that the expansion had failed.  *Syntex Corp. Sec. Litig.*, 95

15  F.3d at 927 (analyzing *Fecht*).  Here, Plaintiffs have not alleged facts that show that Defendants

16  knew these statements to be false when they were made.  Further, Defendants continuously

17  disclosed that there were difficulties at the Lewis leach pad.  "In context, any reasonable investor

18  would have understood [the company's] statements as mere corporate optimism" because "the

19  market already knew" of the difficulties facing the company.  *Intuitive Surgical*, 759 F.3d at

20  1060.  Moreover, while Plaintiffs argue that the statements were intended to induce reliance, that

21  is not a relevant inquiry here.  "Absent an actionable misstatement, reliance does not come into

22  play."  *Intuitive Surgical,* 759 F.3d at 1060.

23                                       **c.  Safe Harbor**

24          Under the PSLRA "Safe Harbor" Provision, "forward-looking statements" are not

25  actionable as a matter of law if they are identified as such and accompanied by "meaningful

26  cautionary statements identifying important facts that could cause actual results to differ

27  materially from those in the forward looking statement."  *See* 15 U.S.C. § 78u–5(c)(1)(A)(i).  A

28  forward-looking statement is "any statement regarding (1) financial projections, (2) plans and

1    objectives of management for future operations, (3) future economic performance, or (4) the

2    assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Joint*

3    *Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing

4    15 U.S.C. § 78u5 (i)).  Similarly, a present tense statement can be covered by the safe harbor if,

5    as a whole, the challenged statements relate to "future expectations and performance." *Intuitive*

6    *Surgical*, 759 F.3d at 1058.  "[I]f a forward-looking statement is identified as such and

7    accompanied by meaningful cautionary statements, then the state of mind of the individual

8    making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's

9    showing of scienter." *In re Cutera*, 610 F.3d at 1112.  Alternatively, if a forward-looking

10   statement is not identified as such or is unaccompanied by meaningful cautionary statements,

11   then the statement is actionable only if the plaintiff proves that the forward-looking statement

12   "was made with actual knowledge by that person that the statement was false or misleading."  15

13   U.S.C. § 78u–5(c)(1)(B).

14          Congress has directed courts to consider all information and documents relevant to a

15   determination of whether a defendant has given adequate warnings for safe harbor protection.

16   The safe harbor provision of the PSLRA provides that "the court shall consider any statement

17   cited in the complaint and any cautionary statement accompanying [a] forward-looking

18   statement, which [is] not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u–

19   5(e) (emphasis added).  Furthermore, with regard to oral forward-looking statements, the safe

20   harbor provision explicitly provides that a written, identified, and "readily available document"

21   may be incorporated by reference.  15 U.S.C. § 78u–5(c)(2)(B).  Any document either "filed with

22   the Commission or generally disseminated shall be deemed to be readily available." 15 U.S.C. §

23   78u–5(c)(3).  While the safe harbor provision does not explicitly provide for incorporation by

24   reference for written forward-looking statements, numerous courts have concluded that

25   cautionary language is not required to be in the same document as the allegedly false or

26   misrepresented statement.  *See e.g., Miller v. Champion Enter. Inc.*, 346 F.3d 660, 677–78 (6th

27   Cir. 2003) (letter alleged to contain false statements contained meaningful cautionary language

28   when it referred to risk disclosures in company's Form 10–K); *Grossman*, 120 F.3d at 1122

16

("[W]hen actually faced with the issue, courts have not required cautionary language to be in the same document as the alleged misstatement or omission."); *Employers Teamsters Local Nos. 175 and 505 Pension*, 353 F.3d at 1132–33 (finding meaningful cautionary language accompanied oral forward-looking statements where, during a conference call, the company referred potential investors to its Form 10–K filed the previous September); *In re PEC Solutions Sec. Litig.*, 2004 WL 1854202, at (E.D. Va. 2004) (forward-looking statements in press release protected by safe harbor where press release incorporated by reference the company's 2002 Form 10–K); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844 (N.D. Ill. 2003) (finding safe harbor applicable where "the documents containing the projections at issue specifically reference other factors listed in ... filings with the SEC"); *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F.Supp.2d 675, 684 (D. Md. 2002) (finding safe harbor protections applied where press release referenced cautionary factors listed in company's SEC filings).

Defendants argue that the alleged misstatements are inactionable as forward-looking statements subject to the safe harbor. For example, they point to statements like "We are on track to meet commissioning deadlines for the north leach pad (late second quarter), Merrill-Crowe plant (third quarter) and gyratory crusher (mid-third quarter)" (March 21 press release), "Sales in the first half of the year are expected to be approximately 90,000 to 100,000 ounces of gold, increasing in the second half of the year" (Jan. 18 press release), and "as we bring up the pH, we expect to get back to what I'm going to call normal leach kinetics and see more gold and silver come off the pads" (May 1 conference call) as statements that are forward-looking on their face and therefore inactionable. Defendants next argue that many of the present tense statements are also protected by the safe harbor because as a whole they relate to future expectations and performance. For example, they point to statements like "[W]e're already seeing the fixes that are required. As I said in the press release, the mine is starting to perform as it should." (April 9 conference call), "Management believes that the [Mill] can be funded with current cash balances, an undrawn revolving line of credit for $120 million, capital lease financing, and operating cash flow." (March 21 press release), and "We believe we are on track to meet previous disclosed six month production guidance of 90,000 to 100,000 ounces of gold" (April 8 press release).

1    Finally, they note that every one of the alleged misstatements was accompanied by meaningful

2    cautionary statements.  Every conference call began by referring listeners to the cautionary

3    statements included in Allied's press releases and on the company's website.  Additionally, the

4    press releases included meaningful cautionary language and further referred investors to the

5    cautionary material discussed in Allied's SEC filings.   Finally, Defendants note that even if the

6    forward-looking statements had not uniformly been accompanied by cautionary language, those

7    statements are still inactionable absent a showing of actual knowledge of falsity.

8         Plaintiffs argue that the safe harbor provision does not insulate Defendants from liability

9    because statements of past or present facts are not covered by the safe harbor provision, even

10   when they are inextricably tied with forward-looking statements.  However, this is not an

11   accurate description of the current law.  The Ninth Circuit recently confronted a similar

12   argument in *Intuitive Surgical*, in which the plaintiffs argued that in the case of statements which

13   mixed non-forward-looking statements with forward-looking ones, the former were still

14   actionable.  759 F.3d at 1059.  The *Intuitive Surgical* court stated it "need not resolve whether

15   the safe harbor covers non-forward-looking portions of forward-looking statements because,

16   examined as a whole, the challenged statements related to future expectations and performance."

17   *Id*. (citing *In re Cutera*, 610 F.3d at 1111) (emphasis added).  Based on this, the Ninth Circuit

18   held two arguably mixed statements to be protected by the PSLRA Safe Harbor.  First, when

19   asked about lower capital expenditures by hospitals, one of the individual defendants in *Intuitive*

20   *Surgical*—an executive at a manufacturer of robotic surgical devices—stated: "At the present

21   time, we don't have any indicators that tell us that's the case.  But we're early into this."  *Id*. at

22   1059 (internal quotation marks omitted).  The Ninth Circuit held that, examined as a whole, the

23   statement is "properly classified as an assumption 'underlying or related to' projections for lower

24   hospital expenditures on Systems."  *Id*. (citing *No. 84 Emp'r–Teamster*, 320 F.3d at 936).

25   Second, when asked if anything in the "external environment" made the executives nervous

26   about purchases in the next twelve months, another individual defendant responded: "[T]here's

27   always a decision within a hospital of how do they prioritize their capital investment ... I think

28   we come up typically fairly high on that priority list.... We aren't hear[ing] anything that causes

18

1    us any significant concern ... no change from last quarter, I guess...."  The Ninth Circuit held that

2    "[i]n context, this statement is properly understood as regarding [the individual defendant's]

3    expectations of the future impact of the external economic environment on Intuitive" and

4    therefore was immunized under the PSLRA Safe Harbor.  *Id.*  Accordingly, to the extent that any

5    of the statements at issue in the instant lawsuit contain both forward-looking and non-forward-

6    looking statements, the Court examines them as a whole to determine whether they relate to

7    future expectations and performance.

8          The mixed statements here are ultimately forward looking.  For example, "Management

9    believes that the [Mill] can be funded with current cash balances, an undrawn revolving line of

10   credit for $120 million, capital lease financing, and operating cash flow" is a statement that is a

11   projection about Allied's future ability to finance the Mill and relates to the assumption that cash

12   flow will be as expected.

13         Next, Plaintiffs argue that the challenged misstatements were not accompanied by

14   meaningful cautionary statements.  They argue that the cautionary statements were boilerplate

15   and warned of risks that were already occurring.  However, securities law does not "demand

16   prescience" and "[a]s long as the [defendant] reveals the principal risks, the fact that some other

17   event caused problems cannot be dispositive."  *Asher v. Baxter Int'l Inc*., 377 F.3d 727, 730 (7th

18   Cir. 2004).  Rather, the cautionary statement need only "identify[ ] important factors that could

19   cause actual results to differ materially from those in the forward-looking statements."  15 U.S.C.

20   § 78u–5(c)(1)(A).  The cautionary statements contained in Allied's press releases and SEC

21   filings were not boilerplate and described factors specifically tailored to the company's business

22   such as "risks relating to fluctuations in the price of gold and silver" and "risks related to the

23   heap leaching process at the Hycroft mine, including but not limited to gold recovery rates, gold

24   extraction rates, and the grades of ore placed on our leach pads."  As to Plaintiffs' point that the

25   cautionary language was insufficient because it remained virtually unchanged as the situation

26   evolved, this does not matter so long as important factors that could cause results to differ

27   materially from the forward-looking statements are identified.  *In re Quality Sys., Inc. Sec.*

28   *Litig*., 60 F. Supp. 3d 1095, 1107 (C.D. Cal. 2014), reconsideration denied (Jan. 5, 2015).

                                          19

"[C]autionary language is not rendered insufficient merely because Defendants utilized similar language in their cautionary disclosures throughout the Class Period." *In re Quality Sys.,* 60 F. Supp. 3d at 1107.

### 2. Scienter

Under the PSLRA, a securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Gompper,* 298 F.3d at 895 (citing 15 U.S.C. § 78u–4(b)(2)); *see also Silicon Graphics,* 183 F.3d at 974 (facts must come closer to demonstrating intent as opposed to mere motive and opportunity). Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness. *See Silicon Graphics,* 183 F.3d at 974. This court considers "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Nursing Home,* 380 F.3d at 1230 (quoting *No. 84 Emp'r–Teamster,* 320 F.3d at 938). In considering whether a strong inference of scienter has been pled, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper,* 298 F.3d at 897 (emphasis in original).

The Supreme Court defined "strong inference" in *Tellabs,* concluding that a securities fraud complaint will survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 127 S.Ct. at 2510. Thus, a court reviewing a complaint's scienter allegations under the PSLRA must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* at 2509. The court must determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* Finally, when "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* This "inquiry is inherently

20

comparative." *Id*. at 2510.  A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference.  *See id*. at 2510; *see also Metzler*, 540 F.3d at 1066.

Plaintiffs argue that their complaint does demonstrate a strong inference of scienter. First, they argue that the confidential witness accounts demonstrate Defendants' awareness of the widespread operational issues at the Lewis pad during the Class Period.  Second, they argue that because the misstatements concerned operations that were critical to Allied, it is reasonable to infer that Defendants knew they were false when they made them.  Third, they argue that sudden, high-level resignations during the Class Period augment the inference of scienter.  Finally, they argue that Defendants were motivated to commit the fraud in order to raise capital in the SPO to keep the company afloat and maintain their jobs.

Defendants argue that the confidential witness statements affirmatively negate any inference of scienter, that the core operations argument misses the mark, that the resignations were not indicative of scienter, and that a generalized assertion of motive is not enough to meet the heightened pleading requirements.

As to the confidential witness statements, Plaintiffs argue that they demonstrate that Defendants were aware of the operational problems at the Lewis leach pad.  For example, several confidential witnesses made statements that it was "common knowledge" that there were problems with the water pipes.  Defendants argue that the confidential witness accounts are too contradictory to support a finding of scienter.  For example, CW1 stated that the extent of the issues facing the Lewis leach pad were not known until at least May.  Further, Defendants note that CW5 claimed to have reported that the existing pipes were inadequate in the presence of Buffington in January 2013, despite Buffington not working there for Allied at the time.

Here, the statements by the confidential witnesses do not give rise to a strong inference that the Defendants acted with the required state of mind.  There are contradictions within the reports of the confidential witnesses on key issues in this case and many of the confidential witnesses statements as to scienter are simply general allegations that the issues were "common

knowledge," which is not enough.  Confidential source statements in a securities fraud complaint are only useable when they "are not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred, provided by persons said to have personal knowledge of them."  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002).  Moreover, the statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation.  *See, In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at * 5 (D. Ariz. Jul. 5, 2006) ("'[C]onfidential witnesses' unreliable or conclusory allegations will not be considered" ); *Metawave Communications Corp. Sec. Litig.*, 298 F.Supp. 2d 1056, 1070 (W.D. Wash. 2003) ("[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough.").  In this case, the confidential witness statements lack corroboration, lack specificity, and are often conclusory, which is not sufficient to give rise to a strong inference of scienter.  *In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009).

Additionally, Plaintiffs point to the temporal proximity between Defendants' misstatements and their admissions that there were issues at the mine as circumstantial evidence of scienter.  Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.  *See Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982*,* 988 n. 5 (9th Cir. 2008) (SEC disclosure two weeks after a misleading statement "bolsters the inference" that defendants had knowledge when they made the statement).  However, this case is distinguishable from the temporal proximity cases cited by the Plaintiffs.  For example, in *Berson*, the executives said they did not know about a stop-work order, but then disclosed it in an SEC filing two weeks later.  *Id.*  Two weeks is a short period of time, much shorter than the alleged time gap here, and a stop-work order is not something that could be discovered gradually, like the problems surrounding the Lewis leach pad.  Similarly in *Ronconi*, the court concluded that the "five week period between the optimistic statements and the below-expectation earnings report is not enough to sustain the complaint."  *Ronconi*, 253 F.3d at 437.  Temporal proximity can bolster a complaint, but it cannot satisfy the requirements of the

1    PSLRA.  *Id.*  Additionally, as Defendants point out, the timeline is also consistent with their

2    argument that it took time for them to discover the operational issues at the Lewis leach pad.

3         Plaintiffs also argue that Defendants must have been aware of the operational issues

4    because the Hycroft mine was Allied's only property, and the Lewis leach pad was one of only

5    three leach pads.  Additionally, Plaintiffs point out that Defendants supervised and oversaw the

6    progress of the mine expansion.

7         Defendants argue that they were aware of some of the issues, and they reported them as

8    they became known; however, they simply did not understand the cause of the problems or the

9    severity of the issues until August.

10        It is inadequate to simply allege that "facts critical to a business's core operations or an

11   important transaction generally are so apparent that their knowledge may be attributed to the

12   company and its key officers." *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir.

13   2003) (quotation and emphasis omitted); *see also DSAM Glob. Value Fund v. Altris Software,*

14   *Inc.,* 288 F.3d 385, 390 (9th Cir. 2002) ("Thus, mere allegations that an accountant negligently

15   failed to closely review files or follow GAAP cannot raise a strong inference of scienter.").

16        However, the Ninth Circuit has recognized two exceptions to this general rule, and has

17   found bare allegations of falsely reported information probative under certain narrow conditions.

18   *See S. Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 785 (9th Cir. 2008) (summarizing the

19   exceptions).  Specifically, falsity may itself be indicative of scienter where it is combined with

20   "allegations regarding management's role in the company" that are "particular and suggest that

21   the defendant had actual access to the disputed information," and where "the nature of the

22   relevant fact is of such prominence that it would be 'absurd' to suggest that management was

23   without knowledge of the matter."  *Id*. at 786 (internal quotations and citations omitted).

24        The first exception permits general allegations about "management's role in a corporate

25   structure and the importance of the corporate information about which management made false

26   or misleading statements" to create a strong inference of scienter when these allegations are

27   buttressed with "detailed and specific allegations about management's exposure to factual

28   information within the company."  *Id*. at 785.  To satisfy this standard, plaintiffs might include in

their complaint "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database," *id.* (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022–23 (9th Cir. 2005)), a specific admission from a top executive that "'[w]e know exactly how much we have sold in the last hour around the world,'" *id.* (quoting *Nursing Home*, 380 F.3d at 1231), or other particular "details about the defendants' access to information within the company." *Id.*

The complaint here does not include the specific admissions described by the Ninth Circuit. For example, in *Zucco*, the Court concluded that allegations that Digimarc's management had access to the purportedly manipulated quarterly accounting numbers, or that the management analyzed the inventory numbers closely, did not support the inference that management was in a position to know that such data was being manipulated. *Zucco Partners*, 552 F.3d at 1001. Plaintiffs in this case have not even alleged that much.

The second exception to *Read–Rite* permits an inference of scienter where the information misrepresented is readily apparent to the defendant corporation's senior management. Where the defendants "must have known" about the falsity of the information they were providing to the public because the falsity of the information was obvious from the operations of the company, the defendants' awareness of the information's falsity can be assumed. *See Berson,* 527 F.3d at 987–89. Nevertheless, reporting false information will only be indicative of scienter where the falsity is patently obvious—where the "facts [are] prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Id.* at 989 (quoting *No. 84 Emp'r–Teamster*, 320 F.3d at 943 n. 21). In *Berson* the court found that the defendant company's misrepresentation of the status of stop-work orders was enough to infer scienter when the four stop-work orders had respectively "halted between $10 and $15 million of work on the company's largest contract with one of its most important customers," "halted $8 million of work," "caused the company to reassign 50–75 employees," and "required [Defendant] to complete massive volumes of paperwork." *See id.* at 988 n. 5 (quotation marks omitted).

///

Here, there were no such obvious smoking guns as the paperwork or reassignment of a large number of employees.  Even if Defendants noticed the buildup of ore or that problems with the leach pad could negatively affect their cash position or expansion plans that doesn't mean they knew why or were wrong to think that the issues could be overcome.  In the cases cited by the Plaintiffs, there was a single, specific, *identified* issue, such as a stop-work order.  That is not the case here.  Even Plaintiffs' confidential witnesses have noted that investigation into the problems surrounding the Lewis leach pad was required, which negates the idea that the falsity of the information Defendants provided was obvious from the operations of the company.

Next, Plaintiffs allege the sudden resignations of Scott Caldwell and Buchan during the Class Period augment the inference of scienter.  Defendants respond that this sort of conclusory allegation is insufficient to plead scienter and that it is hardly surprising Allied wanted a change in leadership given the issues the company was experiencing at the time.

The law is clear that "a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one," and "[m]ere conclusory allegations that a financial manager resigns or retires during the class period … without more, cannot support a strong inference of scienter."  *Zucco Partners,* 552 F.3d at 1002.  Plaintiffs' assertions are conclusory, and they have not alleged any additional facts to show that the resignations are indicative of scienter.  "Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons."  *Zucco Partners,* 552 F.3d at 1002.

Finally, Plaintiffs argue that Defendants were motivated to commit fraud in order to raise $150 million in the SPO, which they contend was a lifeline necessary to counter hemorrhaging costs and instill confidence in the market that the expansion was on track.  Plaintiffs further argue that without the cash, Allied would have gone into bankruptcy even sooner, jeopardizing the jobs of top management, and thus Defendants were motivated to commit fraud to preserve

1    their careers and the company itself.  Defendants respond that a generic desire to raise capital is

2    insufficient to demonstrate scienter.

3            Courts are clear that "the motive to secure financing is a normal business objective, and

4    therefore … it cannot by itself establish scienter."  *In re Wet Seal, Inc. Sec. Litig*., 518 F. Supp.

5    2d 1148, 1174 (C.D. Cal. 2007).  Plaintiffs' allegations as to Defendants' motive are conclusory,

6    and they fail to allege any facts to support the idea that preservation instinct is motivated

7    management to commit fraud.  Allegations that "merely charge that executives aim to prolong

8    the benefits they hold" are, standing alone, insufficient to demonstrate the necessary strong

9    inference of scienter.  *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1130 (2d Cir. 1994).  For

10   this reason assertions that a corporate officer or director committed fraud in order to retain an

11   executive position, simply do not, in themselves, adequately plead motive.  *Phillips v. LCI Int'l,*

12   *Inc*., 190 F.3d 609, 622 (4th Cir. 1999).

13           Finally, the Court is required to "consider the complaint in its entirety to determine

14   whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter ...

15   tak[ing] into account plausible opposing inferences."  *Zucco Partners*, 552 F.3d at 1006.

16           Here, Plaintiffs have not demonstrated that as a whole, their allegations are more

17   plausible than innocent alternatives.  *Zucco Partners,* 552 F.3d at 1007.  Overall, Plaintiffs allege

18   that Defendants knew the extent of the issues at the Lewis leach pad throughout the Class Period,

19   this knowledge motivated the resignations of two high level executives, and Defendants were

20   motivated to lie by a desire to raise money in an SPO necessary to keep the company afloat and

21   maintain their jobs.  However, given all that is before the court, a reasonable inference is that it

22   was likely that it took Allied time to fully understand the magnitude of the problems affecting the

23   Lewis leach pad, and management acted accordingly.  Plaintiff's allegations, taken together, are

24   not "as cogent or compelling" as this plausible alternative inference.  *Zucco Partners,* 552 F.3d

25   at 1007.

26           **3.      Loss Causation**

27           A securities fraud plaintiff must demonstrate loss causation.  *Daou*, 411 F.3d at 1025 (9th

28   Cir. 2005).  To prove loss causation, the plaintiff must demonstrate a causal connection between

the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff. *Id.*; *see also Dura Pharms.*, 125 S.Ct. at 1633 ("[P]laintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.").  "A misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  Therefore, "to plead loss causation, the complaint[ ] must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell*, 396 F.3d at 175.  A plaintiff is not required to show "that a misrepresentation was the sole reason for the investment's decline in value" in order to establish loss causation.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir. 1997) (emphasis added).  "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement" but will play a role "in determining recoverable damages." *Id.*  A plaintiff must plead loss causation "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists" between the material misrepresentations or omissions and the economic loss. *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007).  The heightened pleading standard of "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

Plaintiffs argue that the Complaint adequately alleges that they bought shares of Allied at an inflated price due to Defendants' deceptive conduct, that the stock price fell when the truth was revealed, and that this caused them an economic loss.  They note that Allied's stock price dropped after the first "partial reveal" at the end of April.  While Allied's stock actually increased after the July 22 "partial disclosure," Plaintiffs argue that this was because of surging gold prices.  Finally, they note that Allied's stock price plummeted after the "final reveal" in

August.  Plaintiffs further argue that they do not need to specifically identify what portion of the drop in stock price was caused by falling gold prices and what portion was caused by the fraud.

Defendants argue that Plaintiffs' argument cannot be sustained because Allied's stock price actually rose after the July 22 disclosure, and the sharp decline in the price of gold was the most likely reason for the drop in Allied's stock price in August.

To establish loss causation, "the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Daou*, 411 F.3d at 1025.  The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a "'substantial cause.'" *In re Gilead*, 536 F.3d at 1055-56.  Here, the price of gold is a primary driver of Allied's stock price.  After the July 22 disclosure, Allied's stock price rose, along with the price of gold.  After the August 6 disclosure, Allied's stock price fell, along with the price of gold.  Plaintiffs have not offered an adequate explanation as to why Allied's stock price was tied to the price of gold after one disclosure but not the other.  Because of this, Plaintiffs have not adequately alleged that the alleged material misrepresentations were a substantial cause in the decline in value of their stock, and they have not made a case for loss causation.

## C.    Section 20(a) Claim

Section 20(a) of the 1934 Act provides a basis for holding individuals and businesses liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable....

15 U.S.C. § 78t.  To establish liability under section 20(a), a plaintiff must demonstrate "a primary violation of federal securities law" and that "the defendant exercised actual power or control over the primary violator." *No. 84 Emp'r–Teamster*, 320 F.3d at 945 (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)) (quotation marks omitted); *Paracor Finance., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).  This inquiry is

28

1    normally an "intensely factual question." *Paracor Finance*, 96 F.3d at 1161 (quoting *Arthur*

2    *Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir.1993)).  Section 20(a) claims may be

3    dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of

4    section 10(b).  *See In re VeriFone*, 11 F.3d at 872.

5         As Plaintiffs' have failed to adequately plead a primary violation of Section 10(b), their

6    Section 20(a) claim fails as well.

7    **IV.    Conclusion**

8         IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (ECF No. 103) is

9    GRANTED.  Plaintiffs' Complaint shall be DISMISSED without prejudice.  Plaintiffs shall have

10   thirty (30) days in which to file an amended complaint.

11        DATED this 8th day of August, 2016.

12

13

14                                          _____
                                            LARRY R. HICKS
15                                          UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          29